FILED
GREAT FALLS DIV.

IN THE UNITED STATES DISTRICT COURT

06 JUL 18 AM 11 50

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

BY
DEPUTY CLERK

| | | |
|---|---|---|
| DONALD S. CAPE, | ) | Cause No. CV 03-03-GF-CSO |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND RECOMMENDATION |
| | ) | OF U.S. MAGISTRATE JUDGE |
| CORRECTIONS CORPORATION OF | ) | (Crossroads Defendants' |
| AMERICA, INC.; JAMES MacDONALD; | ) | Motion for Summary Judgment) |
| WILLIAM BOOTHE; K. CRANE; | ) | |
| TIM HAWKE; BEST FOODS, INC.; | ) | |
| ARAMARK INC.; K. KINYON; | ) | |
| Ms. MENGE; Ms. STEVENSON; J.R. | ) | |
| WEISNER; and DEFENDANTS JOHN DOW | ) | |
| 1 through 10, sued in their | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On January 13, 2006, Defendants MacDonald, Boothe, Menge,
Weisner, Crane, Kinyon, Stevenson, and Corrections Corporation of
America (collectively, "Defendants" or "the Crossroads Defendants")
filed a motion for summary judgment based on the doctrines of res
judicata and collateral estoppel. They also asserted that
Plaintiff Cape's claims for declaratory and injunctive relief are
moot. The motion was accompanied by a brief and a statement of
uncontroverted facts ("SUF"). Although Cape was released from
custody on or about June 1, 2005, Defendants also provided a notice

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 1

and warning pursuant to Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998) (en banc), and D. Mont. L.R. 56.2.

Cape responded to the motion on February 6, 2006, by filing a response brief and a statement of genuine issues ("SGI"). Defendants filed a reply on February 17, 2006.

## I. Summary Judgment Standards

A party is entitled to summary judgment if that party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 2

rest upon the mere allegations or denials of his pleading, but ...
must set forth specific facts showing that there is a genuine
issue for trial." <u>Anderson</u>, 477 U.S. at 248.  The non-moving
party may do this by use of affidavits (including his own),
depositions, answers to interrogatories, and admissions.  Only
disputes over facts that might affect the outcome of the suit
under the governing law are "material" and will properly preclude
entry of summary judgment.  <u>Id</u>.

In civil rights cases and in the context of a motion for
summary judgment where a litigant is proceeding pro se, the court
has an obligation to construe the pleadings liberally and to
afford the pro se litigant the benefit of any doubt.  <u>Baker v.
McNeil Island Corrections Ctr.</u>, 859 F.2d 124, 127 (9th Cir. 1988).

## II. Cape's Complaint in This Court

The "Amended and Supplemental Complaint," filed on July 1,
2005 ("Amended Complaint" or "Am. Compl."), and the "Supplement to
the Amended and Supplemental Complaint" ("Supp. Am. Compl."), filed
on July 20, 2005, are the governing pleadings.[1]  The latter
Supplement adds jurisdictional allegations, viz., that the burdens

---

[1] Although a plaintiff generally may not rely on the allegations of his
complaint to meet a motion for summary judgment, Defendants' motion questions
whether Cape's Amended Complaint is subject to res judicata or collateral
estoppel.  Consequently, the allegations of the pleading are crucial.

on religious exercise of which Cape complains either were imposed in a program or activity that receives federal financial assistance or affect commerce among the States or nations or with Indian tribes.   See Supp. Am. Compl. at 2, ¶ 2; Am. Compl. at 2, ¶ 2; 42 U.S.C. § 2000cc-1(b).

As to the Crossroads Defendants, Cape's Amended Complaint alleges that he was a "practicing, traditional, Roman Catholic," Am. Compl. at 6, ¶ 34, while he was incarcerated at Crossroads Correctional Center in Shelby, Montana, beginning in January 2000. Crossroads is owned by the Corrections Corporation of America ("CCA") and contracts with the Montana Department of Corrections to house Montana prisoners.   Cape contends that the Crossroads Defendants violated and conspired to violate his rights under the First, Fourth, and Fourteenth Amendments and under the prisoner provisions of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc-1.   See Am. Compl. at 1-2; id. at 24 ¶ A.1.

Cape alleges that Warden MacDonald and Assistant Wardens Boothe and Weisner[2] "represent the interest(s) and opinion(s) of" Crossroads Correctional Center and Corrections Corporation of

---

[2]   Weisner was named for the first time in the Amended Complaint filed by Cape on July 1, 2005.   Although Weisner was not formally served, counsel filed an Answer on his behalf on July 21, 2005.   See Ans. (doc. 87) at 1.   He has therefore waived any defenses based on insufficient process or service of process or personal jurisdiction, see Fed. R. Civ. P. 12(h)(1), and is a party to this action.

America.  Am. Compl. at 7, ¶ 37.  He claims that MacDonald, Boothe, and Weisner knew of his problems with his religious diet and yet, through their inaction and denial, created an environment hostile to Catholics and allowed discrimination and harassment of Catholics.  Id.  ¶¶ 38-39.  He claims that CCA knew of his grievances but failed to take any action.  Id. at 11, ¶ 57.  He claims that Kinyon and Stevenson had a responsibility to provide access to Catholic religious materials, study groups and worship, and clergy.  Id. at 8, ¶¶ 42-44.  He also claims that Crane and Menge did not adequately investigate or act upon his grievances, that Crane denied him access to the appeals process, and that MacDonald, Boothe, and Weisner did not respond to his grievances. Id. at 8-9, ¶¶ 45-49; 19-20, ¶¶ 121-126.

Cape complains that he was not provided with meals that conformed to his religious need for fish on Ash Wednesday and on Fridays during Lent and all through the year, even though other persons on special diets were provided fish instead of meat.  Am. Compl. at 9, ¶¶ 50-51; 14-15, ¶¶ 81-96.  He also contends that non-Catholic inmates' requests for religious diets were routinely approved by the Crossroads chaplain, but Catholic inmates had to show documentation proving that their requests were religiously required.  Id. at 17-19, ¶¶ 110-119.  Cape claims that he was unable to eat without violating his religious beliefs, "subjecting him to days and weeks without food."  Id. at 22-23, ¶ 142.

Cape avers that he was denied access to Catholic religious literature and study materials, including a Catholic Bible, because inmates were required to purchase religious materials from approved vendors, who only supplied non-Catholic materials.  He also claims that the Defendants confiscated his Catholic religious books, id. at 11-13, ¶¶ 61-72, and stocked the library with only non-Catholic religious materials or materials that "degrade and insult the Catholic Church and call Catholics pagans, satan worshipers and seek to convert Catholics," id. at 16-17, ¶¶ 99-104; denied him access to phone books or other sources where he could obtain the addresses of Catholic churches, organizations, and clergy, and refused to obtain such addresses for him, id. at 13, ¶¶ 73-76; 17, ¶¶ 105-106; and denied his requests for Catholic group prayer and study even though other religious groups were permitted to meet and conduct religious services with outside volunteers, id. at 13, ¶¶ 77-80; 17, ¶¶ 107-109.

Cape also alleges that Defendant Crane intercepted his grievances and failed to forward them to the Montana Department of Corrections, thereby contributing to the denial of his civil rights.  He claims that her actions also deprived him of access to administrative remedies as required by the Prison Litigation Reform Act and that Defendants MacDonald, Boothe, and Weisner failed to respond to his grievances as required by policy.  Id. at 19-20, ¶¶ 121-125.  Finally, he claims that the Crossroads Defendants, except

Stevenson, and the other Defendants conspired in various ways to conceal violations of Cape's rights.  Id. at 20-22, ¶¶ 127-138.

For his relief, Cape seeks declaratory and injunctive relief, compensatory and punitive damages, costs, and other relief to which he may be entitled.  Id. at 24-25, ¶¶ A-F.

### III. Res Judicata and Collateral Estoppel

Defendants argue that Cape's Amended Complaint should be dismissed on grounds of res judicata or collateral estoppel.  They rely on the Montana Supreme Court's decision affirming dismissal of Cape's Amended Complaint filed in Montana's Ninth Judicial District Court on or about February 5, 2001.  See SUF Ex. E (Am. Compl., Cape v. Crossroads Correctional Center, et al., No. DV 00-030 (Mont. 9th Jud. Dist. no date) ("State Am. Compl.")); SUF Ex. L (Order, Cape v. Crossroads Correctional Center, No. 03-172 (Mont. Sept. 21, 2004) ("Mont. Order")).

28 U.S.C. § 1738 requires the federal courts to give preclusive effect to a State's judgments "whenever the courts of the State from which the judgments emerged would do so." Allen v. McCurry, 449 U.S. 90, 96 (1980); see also Manufactured Home Communities, Inc. v. City of San Jose, 420 F.3d 1022, 1031 (9th Cir. 2005) ("To determine the preclusive effect of a state court judgment federal courts look to state law." ) (internal quotations, citations, and brackets omitted).  Doctrines of preclusion apply in § 1983 actions, as well as other actions based on federal law, to

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 7

the same extent they apply in any other case.  Allen, 449 U.S. at 97-98; see also Spoklie v. Montana, 411 F.3d 1051, 1055-56 (9th Cir. 2005) (applying Montana law in determining the preclusive effect of a Montana judgment on federal constitutional issues).

## A. Claims and Decisions in the State Courts

Count 1 of Cape's Amended Complaint in the state court alleged that Defendants Crossroads Correctional Center, CCA, James MacDonald, William Boothe, Best Foods, Inc., and Tim Hawke violated his rights under the First Amendment "by failing to provide him with 'religious meals' during Lent and den[ying] him the ability to observe Lent by eating fish and unleavened bread on Ash Wednesday and Fridays during Lent."  Mont. Order at 2-3; see also State Am. Compl. at 4.  The relief section of Cape's Amended Complaint included a request for injunctive relief to compel the Defendants to provide religious meals "consistent with the Law of Abstinence, tradition, customs of the Catholic Church and the Plaintiff's religious belief(s)" or with the "Law of Abstinence [and] Law of Fasting."  State Am. Compl. at 7, ¶ 2(a), (b).

The trial court dismissed Count 1 of Cape's Amended Complaint on the grounds that it failed to state a claim on which relief might be granted.  The court said that "the pleadings of Plaintiff clearly indicate the requirement of the Catholic religion during these periods is that of abstinence, not consumption."  SUF Ex. G at 2 (Am. Order Granting in Part and Denying in Part Motion to

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 8

Dismiss, Cape, No. DV 00-030 (Mont. 9th Jud. Dist. May 31, 2001))
(emphasis in original).

On appeal, Cape argued that the trial court had set itself up
as the arbiter of the correctness of his religious beliefs. See
Mont. Order at 5-6, ¶ 15. The Montana Supreme Court held that
"Cape failed to allege that his dietary requests of fish and
unleavened bread are essential requirements of a Catholic's diet
during Lent." Mont. Order at 7, ¶ 21. The court also relied on
affidavits filed by Defendants in connection with a motion for
summary judgment on the other counts of Cape's Amended Complaint,
holding that "Cape has offered no evidence to contradict" the
statements of Warden MacDonald or Father Herbert Joseph Pins, id.,
who averred that "the Catholic religion does not require fish to be
consumed on days of abstinence from red meat," that a vegetarian
diet is acceptable, and that Catholics are not required to eat
unleavened bread during Lent. Id. at 6-7, ¶¶ 18-19.

The remaining counts of Cape's Amended Complaint alleged
violations of the First Amendment, the Equal Protection Clause of
the Fourteenth Amendment, and conspiracy. See State Am. Compl. at
4 ("Cause II"), 5 ("Cause III"), 6 ("Cause IV").[3] The state trial

_____

[3] Cause V, see State Am. Compl. at 7, alleged violation of 42 U.S.C. §
1983. Section 1983 is the sole federal vehicle for a plaintiff alleging that his
constitutional rights were violated by persons acting under color of state law.
As Cape pled Cause V, it incorporated Causes I through IV. Id. Presumably, the
Montana Supreme Court considered Cape to have pled a state-law cause of action
for violation of his federal constitutional rights, since it addressed the § 1983
claim as if it was separate from the constitutional claims. See Mont. Order at

court dismissed those counts with prejudice on the grounds that they became moot when Cape was transferred out of Crossroads and "will not return." SUF Ex. K at 2 (Cape, No. DV 00-030 (Mont. Jan. 23, 2003)).

The Montana Supreme Court held that the basis for the trial court's dismissal was erroneous. Mont. Order at 9, ¶ 26. Nonetheless, the Montana Supreme Court affirmed the dismissal, finding instead that Cape had been given "a reasonable opportunity to exercise [his] religious freedom and practice [his] religion," which was all the Constitution required. Id. ¶ 28. The court found that Cape had "access to a priest, as well as to Catholic mass, communion, and confession." Id. at 10, ¶ 29. Cape's conspiracy claims were dismissed as "bare, unsupported, conclusory allegations," id. at 11, ¶ 30, insufficient to withstand a motion for summary judgment. His claim that he was not permitted "to engage in Bible study groups or to review Catholic literature," id. at 12, ¶ 32, was rejected because Father Pins' affidavit attested that these opportunities were not required for Catholics and because Warden MacDonald averred that, for security reasons, an outside religious volunteer was required to meet with and monitor religious groups, id. at 11-12, ¶ 32. Relying on Turner v. Safley,

---

2, ¶¶ 3-4; 13, ¶ 33. Regardless, since the court held that Cape had no claim under § 1983, and since Cape incorporated Causes I through IV, the Montana Supreme Court effectively decided all of Cape's § 1983 claims. Cause V is omitted from all further discussion as redundant.

482 U.S. 78 (1987), the Montana Supreme Court held that Cape's constitutional rights were not violated.  Id. at 13, ¶ 33.

## B. Res Judicata

### 1. Montana Law

Both res judicata and collateral estoppel are "based on a judicial policy favoring a definite end to litigation." Stanley and Carolyn M. Watkins Trust v. Lacosta ("Watkins Trust"), 92 P.3d 620, 626 ¶ 26 (Mont. 2004). "The doctrine of res judicata prevents a party from relitigating a matter that the party has already had an opportunity to litigate." Federated Mut. Ins. Co. v. Anderson ("Anderson"), 991 P.2d 915, 936 ¶ 58 (Mont. 1999). Res judicata applies if:

> (1) the parties or their privies are the same; (2) the subject matter of the present and past actions is the same; (3) the issues are the same and relate to the same subject matter; and (4) the capacities of the persons are the same in reference to the subject matter and to the issues between them.

Watkins Trust, 92 P.3d at 626 ¶ 27. Three additional elements are added by other cases. The court that entered the judgment relied upon must have been a court of competent jurisdiction, see Thornton v. Alpine Home Center, 38 P.3d 855, 858 ¶ 14 (Mont. 2001); the proceedings underlying the judgment must have been fundamentally fair, see Baltrusch v. Baltrusch, 130 P.3d 1267, 1274 ¶ 18 (Mont. 2006); and there must be a final judgment, see Hollister v. Forsythe, 918 P.2d 665, 667 (Mont. 1996).

Where it applies, "[t]he doctrine of res judicata bars not only issues that were actually litigated, but also those that *could have been* litigated in a prior proceeding." In re Marriage of Kolczak, 97 P.3d 1091, 1093 ¶ 14 (Mont. 2004) (emphasis added) (citing Mills v. Lincoln County, 864 P.2d 1265, 1267 (Mont. 1993)). "A party should not be able to litigate a matter that the party already had the opportunity to litigate." Kolczak, 97 P.3d at 1094 ¶ 14 (citing Sheffield Ins. v. Lighthouse Properties, 828 P.2d 1369, 1371 (Mont. 1992)). Where a litigant attempts to pursue a new cause of action on the basis of an event or occurrence that has already been litigated, he is barred by res judicata. See Xu v. McLaughlin Research Inst. for Biomedical Science, 119 P.3d 100, 106 ¶ 35 (Mont. 2005) (applying res judicata to defamation claim against defendant-employer where plaintiff-employee had already litigated claims for wrongful discharge, Montana Human Rights Act violations, emotional distress, and negligence); Troutt v. Colorado Western Ins. Co., 246 F.3d 1150, 1156 (9th Cir. 2001) ("res judicata not only bars claims litigated in a former action, but also claims that might have been litigated in the former action.") (citing Balyeat Law, P.C. v. Hatch, 942 P.2d 716, 717 (Mont. 1997)).

### 2. Application

#### (a) Parties or Their Privies

Defendants CCA, MacDonald, and Boothe were named parties in

Cape's Amended Complaint in state court. They meet the first prong of the res judicata test.

Weisner, Kinyon, Stevenson, Crane, and Menge were not named parties in the state action. They argue that, as employees, they are in privity with their employer CCA because their interests are identical. They rely on Brault v. Smith, 679 P.2d 236 (Mont. 1984), where a shareholder's lawsuit was barred on the grounds that Brault "was a shareholder in a closely-held family corporation involved in a suit over property of the corporation," id. at 239. The court concluded that the closely-held corporation, "through its counsel, [Brault's] father, represented the interests of its shareholders including Kelly Brault." Id. They also rely on DeLeon v. Slear, 616 A.2d 380 (Md. 1992), where Maryland's highest court held that "the doctrine of res judicata generally applies to bar a plaintiff from suing employees for defamation occurring within the scope of employment, when that plaintiff has already unsuccessfully sued their employer for defamation, and when the allegedly defamatory statements in both cases were part of the same transaction or transactions." Id. at 381. The Maryland court, after surveying cases from other jurisdictions, decided that an employer and an employee stand in the same shoes, provided the judgment in the previous action was not based on a defense that was personal to the employer in the previous action.

This case is different from Brault and DeLeon. The Brault

court noted that a shareholder may maintain a derivative action only if the corporation fails to enforce its rights itself, 679 P.2d at 239-40, and, most significantly, that "a decree against the corporation [is] conclusive on its shareholders," id. at 239. Generally speaking, a judgment against an employer is not conclusive on its employees.

In some circumstances, of course, a judgment in favor of an employer might be equivalent to a judgment in favor of an employee. That was the situation in DeLeon. There, the employer's liability in the previous action was based on a theory of vicarious liability, i.e., the employer was liable for the torts of its employees. In alleging defamation against the employer, the plaintiff could be expected to litigate all possible instances in which an employee defamed him in connection with a particular transaction, because a judgment against him would bar him from proceeding in a future action against the employer for claims arising from the same set of facts. See generally Restatement (Second) of Judgments §§ 17, 24 (1982 & Supp. 2005). Consequently, the Maryland court's broad statement of the rule would bar a plaintiff from suing an employee for defamation even based on different statements that were not alleged against the employer, provided those statements were made in the "same transaction or transactions" underlying the suit against the employer. See also Restatement (Second) of Judgments § 51(1) (1982); but see, e.g.,

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 14

<u>Mackey v. Frazier</u>, 106 S.E.2d 895, 897 (S.C. 1959) (inquiring whether privity between employer and employee exists where plaintiff sues latter for "same acts of negligence" previously decided in employer's favor); <u>Davis v. Perryman</u>, 286 S.W.2d 844, 845-46 (Ark. 1956) ("for the same alleged act of negligence"), <u>cited in DeLeon</u>, 616 A.2d at 386.

Here, by contrast, Cape is proceeding under 42 U.S.C. § 1983. There is no vicarious liability under § 1983. A person acting under color of law, within the meaning of the statute, can only be liable if that person "subject[ed]" the plaintiff, or "cause[d] [the plaintiff] to be subjected ... to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983; <u>see also</u> <u>Johnson v. Duffy</u>, 588 F.2d 740, 743-44 (9th Cir. 1978); <u>Stevenson v. Koskey</u>, 877 F.2d 1435, 1438-39 (9th Cir. 1989) (both holding that a § 1983 plaintiff must allege facts demonstrating how each defendant personally caused or personally participated in causing a deprivation of his rights.)[4]

The absence of a vicarious liability theory destroys the

---

[4] "[T]he fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978). Although <u>Monell</u> was concerned with the liability of a municipality, the common denominator between municipalities and private entities like CCA, and the point here, is that both can be "persons acting under color of state law" and subject to suit under § 1983. <u>See, e.g.</u>, <u>Wyatt v. Cole</u>, 504 U.S. 158, 162 (1992); <u>Reginald v. McKnight</u>, 521 U.S. 399, 403 (1997); <u>see also</u> <u>Reginald</u>, 521 U.S. at 414 (Scalia, J., dissenting) ("employees of private prison management firms ... may be sued for acting 'under color of state law.'"). Thus, the <u>Monell</u> rule applies.

reason for the Maryland court's broad statement of the rule. Where there is no vicarious liability, a plaintiff has no means and no obligation to allege against an employer in the first action all possible instances of violation of his constitutional rights. He may allege only those violations for which he believes the employer is personally responsible.

Consequently, this Court does not believe that the Montana Supreme Court would apply the broad privity rule of DeLeon in this case. The employment relationship adds nothing of substance to a privity analysis where there is no vicarious liability. If the individual defendants in this case are in privity with CCA, so is Defendant Aramark,[5] and the Court does not believe that the concept of privity is meant to extend so far.[6] Collateral estoppel may

_____

[5] Defendants suggest that CCA's "assumption of [Crossroads employees'] defense and representation by the same counsel" is evidence of an identity of interests. However, this approach would make litigation strategy a tool for creating a broader res judicata effect than is supported by the plaintiff's claims and the law applicable to them. The legal significance of a judgment cannot be so malleable. Defendants' representation is not evidence.

[6] In General Motors Acceptance Corp. v. Finch, 805 P.2d 1331 (Mont. 1990) (Harrison, J.), the Montana Supreme Court discussed a plaintiff's suit against three contractually-related business entities: Frontier Chevrolet, which sold plaintiff an automobile and, as an agent for Globe Insurance, a disability policy to cover plaintiff's car payments if she was unable to make them; and GMAC, the assignee of Frontier's automobile sales contract. GMAC sued Finch in state court for non-payment. Finch sued Globe, also in state court. She then filed a third-party complaint against Frontier and Globe in the GMAC action and counterclaimed against GMAC. Globe removed Finch's case to federal court, obtained a judgment in its favor, and moved for summary judgment in the state GMAC action on grounds of res judicata. The Montana Supreme Court held that Finch's claims against Globe were barred by res judicata and that her claims against Frontier and GMAC were barred by collateral estoppel. Id. at 1333-34.

The court emphasized that collateral estoppel "bars the same parties, or their privies, from re-litigating issues which have been decided with respect to a different cause of action." Id. at 1334 (emphasis in original) (citing Brault). Today, the Montana Supreme Court places the full "privity" requirement

apply, but there is no privity and so no res judicata defense for Weisner, Kinyon, Crane, Stevenson, or Menge.

### (b) Subject-Matter

Although Cape's freedom to exercise his religion at Crossroads initially appears to be a separate issue from his claim that Defendants MacDonald and Boothe denied him access to the grievance process and the courts, Cape's religious rights formed the content of his grievances.[7]  Under these circumstances, the subject-matter of the instant suit is the same as the subject-matter of the state court action.

### (c) Issues and Relation to Subject-Matter

The most important issue in deciding whether res judicata applies is whether the issues are the same and relate to the same subject matter.   Hollister, 918 P.2d at 667.

### (i) First Amendment Claims

---

in the res judicata test.   Still, the court implicitly found that GMAC and Frontier were in contractual privity with Globe.  Significantly, the court noted that Finch claimed GMAC was liable "as a result of GMAC's own independent acts," but she did not "support this argument with facts of the record."   Id. at 1333. For that reason, the court declined to consider her argument.   It would not have been necessary for the court to mention this fact if it could have found privity despite GMAC's allegedly independent action.   Under § 1983, all defendants act "independently" because it is legally impossible to impute the conduct of one to another.

[7]  To the extent he alleges that Defendant Crane "intercepted and refused to forward Plaintiff's grievances" to the Montana Department of Corrections and that Defendants Crane and Menge failed to properly investigate and determine his claims, the allegations are independent of the merit of the grievances he sought to pursue.  The grievance-procedure and access-to-court claims against Defendants Menge and Crane fail the second prong of the test and so are not barred by res judicata.  However, since the Court has already determined that res judicata does not apply to Crane and Menge, this point is moot.

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 17

This prong is met with respect to Defendants CCA, MacDonald, and Boothe as to all of Cape's First Amendment claims.   Those claims are virtually identical to those raised in state court.

While Cape's Amended Complaint in the state action did not allege that Crossroads contracted exclusively with non-Catholic vendors or that his Catholic religious books were confiscated, he was aware of the additional facts when he was transferred out of Crossroads in September 2002.  He could have amended his pleading to supplement his First Amendment claim[8] at any time before his case was dismissed on January 23, 2003.   He may not allege additional facts against CCA, MacDonald, or Boothe now.

### (ii) RLUIPA Claim

The Montana Supreme Court expressed "no opinion in the instant case about whether Cape's claims are cognizable under the RLUIPA" because "he did not bring his claim under the RLUIPA." Mont. Order at 12 n.1.  Despite this, Defendants argue that the Montana Supreme Court's decision precludes Cape's RLUIPA claim.  To the extent the

---

[8]    That these claims would have fallen under the First Amendment is critical to the decision.   If, for instance, Cape had suffered a serious mishap and was deprived of medical attention, he would have been under no obligation to add an Eighth Amendment claim to his state-court complaint for First Amendment violations.   If the rule were otherwise, so that entry of judgment in one action would result in a res judicata bar in any other pending case, pleadings could only be reliably closed when an inmate was released or transferred.   Here, however, where Cape was trying to establish a First Amendment violation, he had every incentive to supplement his complaint with later-occurring facts before the case was dismissed.

other elements of res judicata are met, Defendants are correct.[9]

Unfortunately, there is not a great deal of precision in courts' usage of the terms "issue" and "claim" in this area of the law.  Nonetheless, because the doctrine of res judicata bars theories of recovery that *could have been* litigated as well as those that were, there must be considerable latitude in the definition of "issue" as it is used in this prong of the res judicata test.  For instance, if "issue" meant "element" or "legal question," res judicata could not have applied in the Xu case to bar a defamation claim, because no question was entertained in the previous action as to whether the plaintiff was defamed. Nonetheless, the factual situation that gave rise to Xu's previous claims was the same situation that gave rise to his defamation claims, and res judicata applied.

Similarly, here, although no court has ever decided whether Cape's rights under RLUIPA were violated, he could have made that claim based on the facts he alleged in the previous action.  The cases he cites to show that he is asserting a "different wrong"

---

[9]    42 U.S.C. § 2000cc-2(c) provides that "Adjudication of a claim of a violation of *section* 2000cc of this title in a non-Federal forum shall not be entitled to full faith and credit in a Federal court unless the claimant had a full and fair adjudication of that claim in the non-Federal forum" (emphasis added). Cape's RLUIPA claim is not brought under § 2000cc, which applies to land use regulations.  It is brought, and only could be brought, under § 2000cc-1, which applies to institutionalized persons.  Therefore, the Full Faith and Credit Act applies to Cape's RLUIPA claim.

actually support the Court's conclusion.[10]  Nor does the fact that amendment is procedurally permissive rather than mandatory settle the matter; the same non-mandatory rule applied to the plaintiff in Xu, yet res judicata barred him from pursuing a defamation claim. See also State ex rel. Harlem Irrigation Dist. v. Montana Seventeenth Jud. Dist. Court, 894 P.2d 943, 946 (Mont. 1995) (applying res judicata to bar new theories of recovery that "*could have been* alleged by amendment of their complaint") (emphasis added).

While Cape claims that he did not have access to RLUIPA, his own exhibits show that he did.  Cape lists "Rights of Prisoners Vol. 1 + 2001 Supplement."  SGI Ex. 9 at 000370 (showing "Effective Date" of March 29, 2002).  That Supplement contains a section on RLUIPA.  See 1 Michael B. Mushlin, Rights of Prisoners § 6.02B (2d

---

[10]  In Gallagher v. Frye, 631 F.2d 127 (9th Cir. 1980), cited in Pl. Resp. at 11, the court declined to apply res judicata because the plaintiff asserted two different wrongs in state and in federal court:

> In this case, the asserted wrong which formed the basis of the state court action was the defendants' failure to comply with the Civil Service Board order.  In federal court, after successfully pursuing the state claim, Gallagher is asserting separate wrongful conduct, i.e., the defendants' attempts to terminate him in the first instance.

Id. at 129.  Thus, the transactional nucleus of operative facts was distinct in the two actions.  Likewise, in Hells Canyon Pres. Council v. USFS, 403 F.3d 683 (9th Cir. 2005), cited in Pl. Resp. at 12, res judicata did not apply because the facts underlying the previously-litigated claim under the National Environmental Policy Act concerned the relocation of a trail without an environmental assessment, whereas the new claim under the Wilderness Act concerned whether a portion of the trail remained within a Wilderness Area even after the relocation. See id. at 690-91.

Contrarily, in this case, Cape seeks to assert a RLUIPA claim based on the same facts that underlay his state-court action.  By amendment, he could have alleged a new legal theory of recovery without alleging a different factual situation.

ed. Cum. Supp. 2001).  Cape had an opportunity to raise a RLUIPA claim because he could have moved to amend his pleading in state court at any time up until the trial court granted summary judgment on the remaining claims on January 23, 2003.  It is too late for him to make a claim against the Defendants who were or were in privity with the defendants in the state court action.[11]

Moreover, even if Cape could show that he lacked access to RLUIPA, that fact would not preclude application of res judicata in this case.  It would merely give Cape a different claim to make against the persons responsible for his lack of access.

### (iii) Access to Courts and Grievance Claims

Cape's allegations against Defendants MacDonald and Boothe with respect to the grievance process could also have been brought in the state-court action.  Cape knew, before he was transferred from Crossroads, that MacDonald and Boothe had denied or failed to respond to his grievances.  Crucially, his religious rights were the point of his grievances.  Consequently, the grievance issue provided him with yet another means of holding MacDonald and Boothe liable for the acts described in the state-court action, and his failure to raise the issue in state court against them bars him

---

[11]    This is not, as Cape objects, a matter of applying the statute retroactively. As Cape himself alleges, the practices and policies at Crossroads of which he complained did not change.  See Pl. Resp. (doc. 109) at 7, ¶ I.B.

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 21

from raising it here.[12]

### (d) Capacities

None of the parties named in the state-court action was named in a different capacity in this action.

### 3. Conclusion

All the elements of res judicata are met with respect to all of Cape's claims against Defendants CCA, MacDonald, and Boothe.

The remaining Crossroads Defendants are not entitled to summary judgment on res judicata grounds.

## C. Collateral Estoppel

### 1. Montana Law

Like res judicata, collateral estoppel can preclude a party from litigating certain matters. It applies, however, at the specific level of legal issues, rather than the general level of theories of recovery. It also prevents a party from relitigating certain fact questions that were decided in a previous action. See Anderson, 991 P.2d at 936 ¶ 59 (Mont. 1999).

Collateral estoppel applies if (1) the same issue was raised

---

[12] Cape would also be collaterally estopped from litigating his grievance claim against MacDonald and Boothe. Officials in policymaking positions may be liable under 42 U.S.C. § 1983 for failing to rectify grievances if their inaction amounts to a policy condoning violation of the right in question. See Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001). The Montana Supreme Court ruled that Cape's religious rights were not violated; consequently, their failure to respond to his grievances about his religious rights could not have caused or contributed to causing a violation of his rights.

and decided in the previous action, (2) there was a final judgment on the merits, and (3) the party against whom estoppel is asserted was a party or in privity with a party in the previous action. Estate of Watkins v. Hedman, Hileman & Lacosta, 91 P.3d 1264, 1272 (Mont. 2004).

### 2. Application

#### (a) Party or Privy and Final Judgment

These two elements are easily resolved.  Cape is the party against whom collateral estoppel is asserted, so the party or privy prong is met with respect to all claims.  While the trial court did not reach the merits of all of Cape's claims, the Montana Supreme Court did.[13]  There was a final judgment on the merits.

#### (b) Identity of Issues

> Identity of issues is the most crucial element of collateral estoppel.  In order to satisfy this element, the identical issue or 'precise question' must have been litigated in the previous action.  To determine whether the issue raised is identical, we compare the pleadings, evidence, and circumstances surrounding the two actions.

---

[13]  Both parties had an opportunity to present evidence in the state trial court, though that court did not consider the evidence in holding that Cape's claims other than Cause I were moot.  Cape complains that he did not have a "Rule 56 hearing," see Pl. Resp. at 15-16, but an in-court evidentiary hearing is required only when a fact-finder must resolve conflicting evidentiary claims. That situation does not arise on summary judgment.  Cape does not claim that he could not submit evidence in the state proceedings in the form of affidavits, as the Defendants did.  See Mont. R. Civ. P. 56(c) ("The adverse party prior to the hearing may serve opposing affidavits.").  Nor has Cape suggested in this Court that he actually had evidence to contradict either Warden MacDonald's or Father Pins' affidavit based on the constitutional standards that applied in the state action.  See note 4, supra.  Thus, Cape had a fair opportunity to present his position on the merits in the state action.  See SUF at 5, ¶¶ 19-20; Mont. Order at 7, ¶ 21; 11, ¶ 30; 12, ¶ 32.

Fadness v. Cody, 951 P.2d 584, 588-89 (Mont. 1997).

### (i) Same Issues

Cape's claim in this case regarding the standards applied to non-Catholic inmates' religious diets as well as the claims regarding his diet on Ash Wednesday and on Fridays during Lent are identical to the claims he made in the state action. Compare Am. Compl. at 9, ¶¶ 50-51; 14-15, ¶¶ 81-96; 17-19, ¶¶ 110-119, with State Am. Compl. at 3 ("Facts in Common Cause I, III, IV, V"), 4, and 6. Because the Montana Supreme Court held that Cape's religious rights were not violated, and because Cape does not allege in this Court any other dietary restriction, the previously-litigated issue extends to Cape's claim that he was forced to choose between eating and adhering to his religious beliefs, see Am. Compl. at 22-23, ¶ 142.

With the exceptions set forth in part (ii) below, Cape's First Amendment, equal protection, and conspiracy claims regarding access to religious materials, study and prayer groups, worship, and clergy were raised in the state courts and decided by the Montana Supreme Court. Compare Am. Compl. at 8, ¶¶ 42-44; 11-13, ¶¶ 61-72; 13, ¶¶ 73-80; 16-17, ¶¶ 99-109, with State Am. Compl. at 4-5; see also Mont. Order at 5, ¶ 13; 8, ¶ 23; 13, ¶ 33. Although Cape did not specifically assert in the state action that Crossroads contracted only with non-Catholic vendors, the Montana Supreme Court held that Warden MacDonald "obtained the proper religious

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 24

materials," Mont. Order at 11, ¶ 30, so there could be no constitutional violation even if Cape's new allegation in this Court is true.

Although the Montana Supreme Court did not address RLUIPA, it held that the absence of a priest at Crossroads was a temporary situation that had concluded as of August 2000 and that inmates had access to a priest, mass, communion, and confession after that time. See Mont. Order at 10, ¶ 29.  RLUIPA was not effective until September 22, 2000.  See Pub. L. No. 106-274, 114 Stat. 803 (Sept. 22, 2000).  Cape had the opportunity to say in state court, or in this Court, that he did not have access to a priest and to mass, communion, or confession after August 2000, but he has not produced any evidence on that point.  Consequently, he is collaterally estopped from asserting any claim, including a RLUIPA claim, for deprivation of access to a priest, mass, communion, or confession.

Finally, because Cape is collaterally estopped from proving any of these alleged violations, he is also precluded from proving his claim regarding Defendant Weisner's role in the grievance process, to the extent the claim depends on grievances concerning lack of access to a priest, mass, communion, or confession.

### (ii) Different Issues

Cape's claims regarding the confiscation of Catholic materials, see Am. Compl. at 12-13, ¶¶ 70-71, and the library's decision to stock "only" materials that "degrade and insult the

Catholic Church and call Catholics pagans, satan worshipers and seek to convert Catholics," id. at 16-17, ¶¶ 99-104, were not raised or decided in the state action.   Nor are they logically precluded by the Montana Supreme Court's ruling.[14]   That MacDonald "obtained" appropriate materials does not mean they were not later confiscated by someone else in violation of the Constitution.

Cape's claim regarding the role of Defendant Weisner in the grievance process, to the extent it rests on these remaining allegations, poses a different issue than was resolved in the state court action.   So do his claims against Menge and Crane for their roles in the grievance procedure and for denial of his right to access to the courts.

Finally, given the parameters of the Montana Supreme Court's decision, Cape's claims under RLUIPA - with the exception of his claim regarding access to a priest, mass, communion, and confession - are different than the claims raised in state court.   RLUIPA provides:

> "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," *unless* the government establishes that the burden furthers "a compelling

---

[14]   Despite the Montana Supreme Court's finding that MacDonald "obtained the proper religious materials," Mont. Order at 11, ¶ 30, it is possible that those materials were later confiscated. Cape cannot proceed against MacDonald, Boothe, or CCA on this basis, but that is no bar to his proceeding against the other Defendants.   Moreover, if the previously provided materials were confiscated, the library may have been left, as Cape alleges, with "only" those materials that he describes as degrading to Catholics.

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 26

governmental interest," *and* does so by "the least restrictive means."

Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)) (emphases in Warsoldier) (brackets omitted).

The "compelling governmental interest" and "least restrictive means" tests supersede the "legitimate penological interest" standard of Turner v. Safley, 482 U.S. 78, 89 (1987), id., making RLUIPA less deferential to prison authorities than a traditional First Amendment analysis.[15]  Additionally, Congress provided that, under RLUIPA, "[t]he term 'religious exercise' includes *any* exercise of religion, *whether or not* compelled by, or central to, a system of religious belief."   42 U.S.C. § 2000cc-5(7)(A) (emphases added).

The Montana Supreme Court made no decision on the application of RLUIPA.   See Mont. Order at 12 n.1.   Nor does its ruling on the other claims preclude Cape's litigation of RLUIPA claims here,

---

[15]   RLUIPA "adopts a protective standard for prisoner religious rights." Kikumura v. Hurley, 242 F.3d 950, 961 (10th Cir. 2001) (referring to RLUIPA as an amendment of the Religious Freedom Restoration Act ("RFRA")) (citing 139 Cong. Rec. S14,465 (daily ed. Oct. 27, 1993) (statement of Sen. Hatch) ("[E]xposure to religion is the best hope we have for rehabilitation of a prisoner. Most prisoners, like it or not, will eventually be returning to our communities. I want to see a prisoner exposed to religion while in prison. We should accommodate efforts to bring religion to prisoners."); id. at S14,466 (statement of Sen. Dole) ("[I]f religion can help just a handful of prison inmates get back on track, then the inconvenience of accommodating their religious beliefs is a very small price to pay."); id. (statement of Sen. Hatfield) ("Mr. Colson's prison ministries group, which has successfully rehabilitated many prisoners, has been denied access to prisoners in Maryland ... who did not identify themselves as [P]rotestants.... [This is an] example[ ] of the need for us to pass this bill without this amendment [which would exclude prisons from RFRA].")

because the "precise questions" appropriate to constitutional claims are different than the questions that arise as to RLUIPA claims.   The Montana Supreme Court decided only that Cape's First Amendment rights were not violated by Crossroads' provision of food services and that the other restrictions placed on Cape's religious exercise were reasonably related to legitimate penological interests.   See Mont. Order at 8, ¶ 22; id. at 12, ¶ 32.   Since those determinations do not preclude relief under RLUIPA, the RLUIPA claims, other than the claim regarding access to a priest, mass, communion, and confession, are not barred.[16]

### 3. Conclusion

All of Cape's constitutional and conspiracy claims regarding religious exercise are collaterally estopped, except for those regarding the confiscation of Catholic materials, see Am. Compl. at 12-13, ¶¶ 70-71, and the library's decision to stock "only" materials that "degrade and insult the Catholic Church and call Catholics pagans, satan worshipers and seek to convert Catholics," id. at 16-17, ¶¶ 99-104.   Collateral estoppel also applies to Cape's claims against Weisner for his role in the grievance process, except as to any grievances presented to Weisner relating to confiscation of materials or the library's choice of religious material.

---

[16] See note 16, Findings and Recommendation on Hawke Defendants' Motion for Summary Judgment.

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 28

However, collateral estoppel does not apply to bar any of Cape's grievance or access-to-court claims against Defendants Menge or Crane.  Nor does it bar his RLUIPA claims, except for his claim regarding access to a priest, mass, communion, and confession.

## IV. Failure to State a Claim or Mootness

### A. Suit Against Individuals and Money Damages

The Crossroads Defendants assert that Cape can make no claim for monetary damages under the RLUIPA.  They also claim that RLUIPA does not authorize suits against individuals in their individual capacities but only suits against persons acting in an official capacity.  For the reasons set forth in Part V.A of the Findings and Recommendation on the Hawke Defendants' Motion for Summary Judgment, the Court concludes that there is no reason to believe that Cape may proceed only against persons in their official capacities and no reason to believe that his remedies under RLUIPA against defendants who lack sovereign immunity are limited to prospective relief only.  Cape's claim for money damages should not be dismissed.

### B. Declaratory Relief

Because Cape has been released, declaratory relief is no longer available.  "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor ... afford relief from the uncertainty

and controversy faced by the parties." United States v. Washington, 759 F.2d 1353, 1357 (9th Cir. 1985) (en banc). Since Cape and the Defendants no longer have a legal relationship, and since any uncertainty as to the Defendants' continuing course of conduct was mooted by Cape's release, declaratory relief would not be useful. Moreover, circuit law counsels against granting declaratory relief as to "a wholly past violation of federal law." Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir. 1992). Cape's request for declaratory judgment should be dismissed.

### C. Injunctive Relief

Cape also lacks standing to obtain injunctive relief. The standing doctrine arises from the "cases and controversies" requirement of Article III, but, where a request for prospective relief is concerned, it demands that a plaintiff "establish a real and immediate threat" of injury in the future. See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983) (distinguishing between standing to seek damages and standing to obtain injunctive relief). Cape cannot show such a threat here. In order to be detained once again at Crossroads, he would have to violate the conditions of his release on parole, be sent back to prison by the Parole Board, and be designated by the Department of Corrections for placement at Crossroads, rather than one of several other facilities. Those possibilities are far too remote to allow Cape to show a "real and

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 30

immediate threat" sufficient to support his request for injunctive
relief. Cape's request for injunctive relief should be dismissed.

### D. Grievance Procedure and Access to Court Claims

Pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii),[17] the Court may
dismiss an action at any time if it determines that the plaintiff
fails to state a claim on which relief may be granted.

Cape claims that Crane and Menge did not adequately
investigate or act upon his grievances and that Weisner did not
respond to his grievances. Am. Compl. at 8-9, ¶¶ 45-49; 19-20, ¶¶
121-126. Cape also alleges that Defendant Crane intercepted his
grievances and failed to forward them to the Montana Department of
Corrections, thereby contributing to the denial of his civil
rights. He claims that her actions also deprived him of access to
administrative remedies as required by the Prison Litigation Reform
Act and that Defendant Weisner failed to respond to his grievances
as required by policy. Id. at 19-20, ¶¶ 121-125.

To be liable under § 1983, a defendant must cause or
personally participate in causing a deprivation of rights. See,
e.g., Johnson, 588 F.2d at 743-44; Stevenson, 877 F.2d at 1438-39.
A cause of action under 42 U.S.C. § 1983 lies only for violations
of federal law. Policy or contract violations are not actionable;

---

[17] Cape moved to proceed in forma pauperis on September 30, 2002 (Court's doc. 1). The motion was granted on January 10, 2003 (Court's doc. 4). Accordingly, § 1915 applies.

neither are violations of state law. See, e.g., Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921, 929-30 (9th Cir. 2001); Ove v. Gwinn, 264 F.3d 817, 824 (9th Cir. 2001). Nor is an inmate constitutionally entitled to a grievance procedure. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988) (citing Shango v. Jurich, 681 F.2d 1091, 1100 (7th Cir. 1982), and Azeez v. DeRobertis, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993).

Cape's allegations against Weisner fail to state a claim on which relief may be granted. Cape alleges only that Weisner failed to respond as per policy. That is not actionable. The grievance claim against Weisner should be dismissed.

Moreover, when a grievance officer fails to reach the correct legal conclusion about an inmate's grievance, she does not cause a constitutional violation. The alleged violation must occur before the grievance officer reads about it. Unless the grievance officer has policy-making authority, she does not contribute to causing a continuing constitutional violation by failing to recognize one when she sees it. Only policymakers may be subject to liability for their failure to rectify grievances, and only if their failure to respond amounts to a policy of condoning the violation in question. See Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001). Consequently, Cape has no claim against Defendant Menge, whom he accuses only of failing to properly investigate and decide

his grievances.  See Am. Compl. at 9, ¶¶ 48-49.  He also has no claim against Defendant Crane, to the extent he alleges the same thing against her.  Id. at 8-9, ¶ 45.  However, to the extent that he alleges Crane "intercepted and refused to forward Plaintiff's grievances," he states a claim against her sufficient to go forward.  See Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995).

Cape's claim for deprivation of access to the courts also fails to state a claim.  In order to state a claim for violation of his right to access the courts, Cape must show that he suffered an actual injury, "such as the inability to meet a filing deadline or present a claim."  Lewis v. Casey, 518 U.S. 343, 348 (1996).  Given the litigation history underlying this lawsuit and the Defendants' exhibits showing Cape's knowledge of RLUIPA, it is impossible to believe that Cape suffered any inhibition, much less a violation, of his right to access the courts.  The access claim should be denied.

### E. Does Cape's Pleading State a Claim Under RLUIPA?

The Court has considered whether Cape's Amended Complaint states a claim on which relief may be granted under RLUIPA.  See 28 U.S.C. § 19015(e)(2)(B)(ii).  For the reasons set forth above and in the Findings and Recommendation on the Hawke Defendants' Motion for Summary Judgment, Part V.D, Cape may proceed under RLUIPA, with the exceptions identified herein.

\

## V. Conclusion: **What Remains At Issue**

If the Recommendation below is adopted, the following claims will remain at issue:

- Cape's claim against Defendant Crane regarding her interception of and refusal to forward Cape's grievances;

- First Amendment, equal protection, and conspiracy claims against Defendants Crane, Kinyon, Menge, Stevenson, and Weisner regarding the confiscation of Catholic materials, <u>see</u> Am. Compl. at 12-13, ¶¶ 70-71, and the library's decision to stock "only" materials that "degrade and insult the Catholic Church and call Catholics pagans, satan worshipers and seek to convert Catholics," <u>id</u>. at 16-17, ¶¶ 99-104; and

- all RLUIPA claims against Defendants Crane, Kinyon, Menge, Stevenson, and Weisner, except for Cape's claim that he lacked access to a priest, mass, communion, or confession.

Based on the foregoing, the Court enters the following:

### RECOMMENDATION

1.   The Crossroads Defendants' motion for summary judgment (doc. 101) should be GRANTED in part and DENIED in part.

2.   The following claims should be DISMISSED WITH PREJUDICE:

a.   all First Amendment, equal protection, conspiracy, and RLUIPA claims against Defendants Corrections Corporation of America, James MacDonald, and William Boothe regarding Cape's ability to exercise his religion;

b.   First Amendment, equal protection, and conspiracy claims against Defendants Crane, Kinyon, Menge, Stevenson, and Weisner regarding Cape's ability to exercise his religion, EXCEPTING the claim regarding confiscation of Catholic materials, <u>see</u> Am. Compl. at 12-13, ¶¶ 70-71, and the library's decision to stock "only" materials that "degrade and insult the Catholic Church and call Catholics pagans, satan worshipers and seek to convert

Catholics," id. at 16-17, ¶¶ 99-104;

c.    the RLUIPA claim for deprivation of access to a priest, mass, communion, and confession;

d.    the access-to-courts claim; and

e.    all claims relating to the roles of Defendants MacDonald, Boothe, Crane, and Menge in the grievance process, EXCEPTING the claim regarding Crane's alleged interception of and refusal to forward Cape's grievances.

3.    Defendants Corrections Corporation of America, MacDonald, and Boothe should be DISMISSED.

4.    Cape's claim regarding Weisner's role in the grievance process should be DISMISSED.

5.    Cape's requests for declaratory and injunctive relief should be DISMISSED.

The Clerk of Court shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to these findings must be filed or delivered to prison authorities for mailing within twenty (20) calendar days after the entry date reflected on the Notice of Electronic Filing, or objection is waived.

Cape must immediately notify the Court and counsel for the Defendants of any change of address.  Failure to do so may result in dismissal of this case without further notice.

DATED this 18th day of July, 2006.

Carolyn S. Ostby
United States Magistrate Judge

FINDINGS AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE / PAGE 35